16 F.3d 401
NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
 Syed M. ZAFAR, M.D., Ph.D., Plaintiff, Appellant,
v.
ROGER WILLIAMS GENERAL HOSPITAL, Defendant, Appellee.
 No. 93-1390.
 United States Court of Appeals,
First Circuit.
 January 13, 1994
 
 Appeal from the United States District Court for the District of Rhode Island
 Bruce Hodge for appellant.
 William P. Robinson III with whom Stephen M. Prignano and Edwards and Angell were on brief for appellee.
 D.R.I.
 AFFIRMED.
 Before Stahl, Circuit Judges, Aldrich and Campbell, Senior Circuit Judges.
 CAMPBELL, Senior Circuit Judge.
 
 
 1
 Dr. Syed M. Zafar filed suit in 1990 alleging that Roger Williams General Hospital ("the Hospital") had broken its contract with him by failing to provide him with a medical residency program approved by the Accreditation Council for Graduate Medical Education ("ACGME"), by failing to certify to the American Medical Association ("AMA") that he had successfully completed a one-year internship in such a program, and by failing to provide certain procedural rights due to him under the contract. After a bench trial, the United States District Court for the District of Rhode Island found for the defendant Hospital. Dr. Zafar appeals, and we affirm.
 
 I.
 
 2
 In July 1983, the Hospital and Dr. Zafar entered into a written agreement whereby Dr. Zafar agreed to serve as a "rotating intern" for one year, at the first postgraduate year level. Zafar agreed, inter alia, "to develop a personal program of self study and professional growth," "to participate in safe, effective and compassionate patient care," and "to adhere to established practices, procedures, and policies of the Hospital...."
 
 
 3
 In return, the Hospital agreed to provide: "a suitable environment for medical education experience"; a training program accredited by the ACGME; and "a mechanism, with appropriate due process safeguards, whereby actions which impact upon the Resident's status and/or career development may be addressed."
 
 
 4
 The agreement stated that the parties could be released from their "ethical and legal obligations" to fulfill their responsibilities under the agreement if either of two conditions occurred: first, if the "Resident Physician" for reason of illness or "other good cause acceptable to the Hospital" could not continue; second, if "in the judgement of those responsible for the Program, the Resident Physician, following timely notice and opportunity to be heard, has failed to perform and discharge his/her responsibilities in acceptable manner...." In the latter case, the agreement would terminate "only after recourse, if so desired by the Resident Physician, to the Due Process mechanism" earlier referred to in the agreement.
 
 
 5
 Although this agreement was modeled on the form contract used for other resident physicians at the Hospital, the agreement with Dr. Zafar was altered in several ways. For example, Dr. Zafar was not to receive any salary, life insurance, disability insurance, or vacation. Dr. Zafar agreed to such limitations apparently because he had been late in applying for internship positions, and had gained the position at the Hospital only after a friend, Dr. Naeem Saddiqui, helped him gain an entree by introducing him to Dr. William Klutz, the chairman of the Hospital's Department of
 
 
 6
 Surgery at the time. Dr. Zafar's situation was unique also in that he expected to be at the Hospital for only one year, instead of the usual three year period for most residents.
 
 
 7
 Soon after executing the agreement, Dr. Zafar began his internship at the Hospital. He was placed in the internal medicine program, which at the time was the only ACGME-approved residency program at the Hospital. He began making rounds with the other residents in the internal medicine program.
 
 
 8
 Shortly after Dr. Zafar began performing duties as a medical intern, his supervisor, a Dr. Burtt, learned of several highly critical evaluations of Dr. Zafar's work. After some investigation, Dr. Burtt recommended to the assistant director of the residency program that Dr. Zafar be taken off of medical service. Dr. Burtt also went to Dr. Klutz, as he had been responsible for bringing Dr. Zafar into the program. Dr. Burtt explained to Dr. Klutz that he believed Dr. Zafar was not competent to serve in the internal medicine program and that the Hospital would have difficulty graduating him from the program. He suggested that Dr. Zafar be rotated to the department of surgery for the remainder of the year.
 
 
 9
 According to Dr. Klutz's contemporaneous notes, he met with Dr. Zafar on October 7, 1983. Dr. Klutz informed Dr. Zafar that he had received an unsatisfactory evaluation and stated that Dr. Zafar had the option of either seeking an appointment to another hospital or moving into the department of surgery. According to Dr. Klutz, Dr. Zafar chose to transfer to surgery within a few days of the October 7 meeting.
 
 
 10
 At trial, Dr. Zafar testified that he did not meet with Dr. Klutz in October, 1983, and that Dr. Klutz never told him of any poor performance evaluations nor discussed with him the possibility of leaving the Hospital. Dr. Zafar testified that Dr. Klutz did inform him he was being transferred to the department of surgery, but had offered no explanation for the transfer. Moreover, according to Dr. Zafar, Dr. Klutz did not notify him of his imminent transfer until late November, 1983. Dr. Zafar also testified that in late November he received a copy of a memo from a Dr. Vito in the department of surgery that was addressed to head nurses and operating room personnel. The memo explained that Dr. Zafar would begin "covering" the surgical patients of Dr. Vito and three other physicians, and would be responsible for making daily rounds on those patients and "entering progress notes and writing orders as necessary." Dr. Zafar was also to be "available to answer questions concerning patient management."
 
 
 11
 Dr. Zafar admitted to having known that the Hospital did not have an ACGME-approved residency program in surgery. Nevertheless, Dr. Zafar never inquired whether he would receive credit nor did he invoke the due process rights mentioned in the contract. He finished the year in the department of surgery and thereafter left the hospital.
 
 
 12
 Subsequent to his departure, Dr. Zafar began the process of applying for medical licensure in New Jersey. In July of 1984, the Hospital sent to the New Jersey medical licensing authority a certificate stating that Dr. Zafar had successfully completed a one-year "mixed internship" approved by the AMA. Sometime during 1989, however, Dr. Zafar learned that AMA records did not show him as having completed an approved program at the Hospital. After some correspondence with the Hospital, Dr. Zafar filed suit in 1990 alleging that the Hospital had breached the July 1983 agreement by failing to certify to the AMA that he had successfully completed an approved medical internship.
 
 
 13
 The case was tried without a jury in February and March, 1993. After the plaintiff's case, the district court found that Dr. Zafar did not complete an accredited internship and was therefore not entitled to have the Hospital certify that he did. The district court found that the Hospital's own representations in the New Jersey certificate had been in error and that it was "unfortunate" that the certificate had been sent.
 
 
 14
 The district court went on to hear more evidence on the issue of whether Dr. Zafar was denied the due process rights guaranteed him under the contract. After hearing all the evidence, the district court found that Dr. Zafar had received actual notice of his poor performance, that he had the opportunity to pursue the matter and to contest the allegations if he had so chosen, and that he had chosen not to do so. The court concluded that the Hospital had not violated any terms of the contract with Dr. Zafar.
 
 
 15
 We affirm.
 
 II.
 
 16
 On appeal, Dr. Zafar no longer argues that he is entitled to have the Hospital certify that he completed an ACGME-approved internship. He argues that the Hospital broke its agreement with him by failing in the first instance to provide an approved program, or, in the alternative, by failing to afford due process before transferring him out of the internal medicine residency, which was the sole approved program.
 
 
 17
 Dr. Zafar's first argument, that the Hospital broke the agreement by failing to provide an approved residency program, is undercut by Dr. Zafar's concession that when he began his internship at the Hospital he was in an approved program. He seeks to counteract this by asserting that the Hospital had enrolled him in a unique one-year "rotating internship" that began in an approved program (i.e., the internal medicine internship) but that required him to rotate among various unaccredited departments, including surgery. He argues that this "rotating internship" would not be accredited, and that the Hospital, therefore, was from the start in breach of its agreement to furnish an accredited program.
 
 
 18
 Dr. Zafar's argument is essentially factual and was resolved against him by the district court. We cannot say the court committed clear error in not finding that Dr. Zafar had been enrolled in some new, hybrid program for which AMA credit was unavailable even had he successfully completed it. To be sure, both Dr. Klutz and Dr. Calabresi, the chairman of the Department of Medicine at the Hospital during 1983-84, testified that they had expected Dr. Zafar to rotate to other specialties during his time at the Hospital. There was substantial evidence, however, that rotation was possible within the approved internal medicine program and could have been accomplished while receiving full credit. According to the Policies and Procedures of the American Board of Internal Medicine, which were admitted as evidence at trial, twelve months of credit can be received for the first postgraduate year of training if the resident spends at least six months in internal medicine and an additional two months in pediatrics, dermatology, neurology, and/or emergency room care. The remaining four months can be spent in another specialty, such as surgery. This, apparently, explains the use of the term "rotating intern"-in fact, according to the Policies and Procedures, the first year of postgraduate training in internal medicine was called a "rotating internship." Both Dr. Calabresi and Dr. Klutz testified to an accredited "rotating" program of this type.
 
 
 19
 The district court found that Dr. Zafar was switched to the unaccredited program only when his supervisor in the approved internal medicine program determined that his work was so unsatisfactory that he should not be allowed to continue in it. Dr. Zafar was thus forced to leave the critical internal medicine component short of the required six months minimum necessary to receive credit, and without a satisfactory record. This was allowed by the contract, which expressly authorized the Hospital to drop Dr. Zafar from the accredited program if he "failed to perform and discharge his[ ] responsibilities in an acceptable manner"-assuming proper notice and opportunity to be heard, and recourse to the due process mechanism if so requested, infra. The district court was justified in finding, therefore, that the Hospital was not in breach of its contract from the start for failure ever to have offered an accredited program.
 
 
 20
 Dr. Zafar's second argument is that the Hospital violated the agreement by denying him his contractual due process rights at the time he was transferred out of the approved program. He argues that the Hospital had no "mechanism," as required by the contract, to redress actions that would affect the residents' careers. Also, Dr. Zafar suggests that the Hospital broke the contract by failing to provide him with adequate notice of his subpar performance and of the fact that the shift to surgery would result in critical alterations in his intended career development.
 
 
 21
 The district court considered these points and rejected them. The court found as a fact that a "mechanism was in place" for Dr. Zafar to exercise his due process rights. This mechanism was outlined in a document entitled "Due Process For Resident Physicians," which Dr. Zafar's counsel introduced at trial and quoted in his closing argument. This document specifically refers to the provision in the generic contract used for resident physicians (and used in modified form for Dr. Zafar) containing the requirement for providing a mechanism for due process. We do not think it was clear error for the district court to conclude that such a mechanism existed.
 
 
 22
 The Hospital was not required, however, as a condition to dropping Dr. Zafar from the approved program, to automatically engage the elaborate due process protections spelled out in "Due Process For Resident Physicians." By the terms of the agreement, the due process "mechanism" required by the agreement to "address" actions taken by the Hospital would came into play only if "desired by the Resident Physician." Dr. Zafar never announced such a desire. He admitted at trial that he knew he had due process rights available to him under the contract but that he never invoked those rights.
 
 
 23
 Since Dr. Zafar never invoked the due process mechanism mentioned in the contract, his argument is limited to the contention that he did not receive the "timely notice and opportunity to be heard" that under the contract must precede a determination by those responsible for the program that he failed to perform acceptably. The district court heard extensive testimony on this point and found that the Hospital had satisfied its duties under this clause.
 
 
 24
 This might have been a close issue on the facts. None of the doctors at the Hospital, including Dr. Klutz or Dr. Calabresi, testified to having told Dr. Zafar explicitly that upon his early transfer to surgery he would not receive credit for completing an ACGME-certified internship. To be sure, Dr. Zafar admitted that he knew the Hospital did not have an accredited residency program in surgery. This admission was perhaps not damning to his case, however, because there was evidence, supra, that Dr. Zafar might have rotated to surgery at some later point within the accredited "rotating internship" for which he originally contracted.
 
 
 25
 Arguably, Dr. Zafar misunderstood the import of his enforced transfer to surgery and underestimated the seriousness of his situation.
 
 
 26
 Nonetheless, the contract did not require written notice, and the district court found that Dr. Zafar had orally received "actual notice" of his predicament at the October 7, 1983, meeting with Dr. Klutz. As a result, the court found that Dr. Zafar was properly "charged with knowledge" of his situation, and that "he had an opportunity for discussion and for hearing to contest those allegations if he wanted to pursue that matter, and he chose not to pursue that avenue." These findings are sufficiently supported by the evidence. Dr. Zafar admitted that there had been questions about his performance, and Dr. Klutz testified that he told Dr. Zafar his evaluations had been unsatisfactory and that he believed that Dr. Zafar knew the seriousness of his situation. Dr. Zafar also stopped doing rounds with the residents in the approved medicine program. Moreover, Dr. Zafar received the memo from Dr. Vito that he would be transferring to surgery, when he had expected to be in internal medicine for at least six months and knew that surgery was not accredited.
 
 
 27
 It is significant that Dr. Zafar's testimony directly contradicted that of Dr. Klutz, leaving the court-upon believing Dr. Klutz-with understandable doubts about
 
 
 28
 Dr. Zafar's credibility generally. The district court's findings rested, in significant part, on determinations of the credibility of the witnesses, for which we are required to give "due regard." Fed. R. Civ. P. 52(a). In discussing the crucial October 7 meeting between Dr. Zafar and Dr. Klutz (which Dr. Zafar essentially denied ever took place), the district court stated: "Doctor Klutz has his notes of that meeting and I believe his testimony as to what occurred at that meeting." The court said that it was
 
 
 29
 satisfied that Doctor Klutz's testimony is accurate and at that meeting on October 7, 1983, Doctor Klutz told the plaintiff of his unsatisfactory evaluation in the same terms that Doctor Burtt had related to Doctor Klutz, and that he told him of the options-that the plaintiff, at that point, was not to be kept in the accredited program and he had two choices. He could seek an appointment to another Hospital or he could go on to an internship in surgery which, by the plaintiff's own testimony, he knew was not an accredited program.
 
 
 30
 The district court also stated that it was convinced that "Dr. Klutz told [Dr. Zafar] that he ought to talk to Doctor Burtt" about his negative evaluations, but that Dr. Zafar never did so.
 
 
 31
 The judge contrasted the believability of Dr. Klutz with that of Dr. Zafar:
 
 
 32
 It's obvious what the plaintiff was doing here during his testimony at the beginning of this case. He was trying to convince the Court that he was blissfully ignorant of what was going on around him at the time; that he didn't realize that those in the internal medicine program were dissatisfied with his performance to the point of expelling him from that program.... The attempt of the plaintiff to portray this ignorance ... is disingenuous, and that's as polite as I can make it.
 
 
 33
 Based on these credibility determinations and factual findings, the district court concluded that Dr. Zafar had received actual notice and had received an opportunity for discussion of his performance. This resolution of the evidence is not clearly erroneous. See Anderson v. Bessemer City, 470 U.S. 564, 574 (1985).
 
 
 34
 Dr. Zafar also argues cursorily that he was denied constitutional due process rights. The district court found that the due process mechanism in the contract did not import constitutional standards. Especially as the Hospital is not a state actor, we accept that conclusion. See, e.g., National Collegiate Athletic Ass'n v. Tarkanian, 488 U.S. 177, 191 (1988).
 
 
 35
 Affirmed. Costs to appellee.